FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 2 1 2006 ★

P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

C.V.R. REDDY M.B.B.S.,

      Plaintiff,

- against -

JOSEPH PUMA, D.O. and TERRENCE SACCHI,
M.D.,

      Defendants.

------------------------------------------------------X

**MEMORANDUM AND ORDER**

1:06-cv-1283-ENV-KAM

VITALIANO, D.J.

  Plaintiff C.V.R. Reddy ("Dr. Reddy") brings this action, pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), against defendants Joseph Puma ("Dr. Puma") and Terrence Sacchi ("Dr. Sacchi"). Dr. Reddy alleges that defendants, as well as others whose identities are unconfirmed, entered into a contract, combination, or conspiracy to eliminate Dr. Reddy from competition through unfair business conduct. Dr. Reddy claims that this conduct enabled defendants to control the market for interventional cardiology care in Staten Island and western Brooklyn.[1]

  Defendants have moved, pursuant to Fed R. Civ. P. 12(b)(6), to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted. For the reasons set forth, defendants' motion is denied.

---

[1] While Dr. Reddy's papers do not precisely define "western Brooklyn," the area is said to include Park Slope, Red Hook, and Bay Ridge. The Court notes that, for purposes of this motion, defendants have not contested the relevant market put forth by Dr. Reddy.

# FACTS

Dr. Reddy, Dr. Puma, and Dr. Sacchi are all licensed to practice medicine in New York. During the period relevant to this action, all three were affiliated with New York Methodist Hospital ("Methodist"), a healthcare facility in Park Slope, Brooklyn.

Dr. Reddy is a cardiologist who specializes in the use of catheters for therapeutic purposes. In 1991, he joined Methodist as a salaried staff physician with the position of chief of cardiology. His new position at Methodist was not exclusive. Dr. Reddy continued in other positions that he had previously held. Specifically, he continued to serve as an associate clinical professor of medicine at Weill Medical College of Cornell University and also as a member of the attending staff of New York Presbyterian Hospital in Manhattan, where he concentrated in interventional cardiology. At Methodist, Dr. Reddy established the facility's first cardiac catheterization lab and became its director in 1993. In its first four years, the volume of patients treated in the lab increased from 350 to 1100. Dr. Reddy's work at this time included cardiological consultations, diagnostic work in the catheterization lab, and educational activities related to Methodist's residency programs. Dr. Reddy also gave lectures for which he received stipends from pharmaceutical companies.

In 1998, at Dr. Reddy's urging, Methodist hired an experienced electrophysiologist, John Kassotis ("Dr. Kassotis"), to become director of Methodist's electrophysiology lab. Dr. Kassotis's work involves the use of cardiac catheters to treat the electrical systems of the heart. His use of catheters is different from that of Dr. Reddy, whose main use of catheters is in vascular procedures. Thus, while doctors Reddy and Kassotis both use catheters to treat aspects of heart disease, their practices were complementary; they were able to share equipment and to

2

cross-refer patients. The combination was allegedly a beneficial one as the two doctors saw several dozen patients daily at the height of their respective practices, which was approximately 35 to 40% of all volume in Methodist's cardiology division.

In 2001, Dr. Reddy urged Methodist to apply to the New York State Department of Health ("DOH") for permission to establish a combined cardiac surgery and interventional program. In 2003, DOH granted permission and Methodist established a program which specialized in the prevention, diagnosis, and treatment of heart disease though procedures involving angioplasty and conventional cardiac surgery. The program was up-and-running by April 2004, at which time Methodist became one of the few hospitals in the region with the capacity to perform stent implantation though angioplasty.

In September 2003, shortly after it had received permission from the DOH to establish the cardiac surgery and interventional program, Methodist demoted Dr. Reddy from chief of the cardiology division to chief of clinical cardiac services. Shortly thereafter, Dr. Sacchi was named chief of the cardiology division and Dr. Puma was named director of the catheterization lab. Right after this change in staffing, Dr. Reddy alleges that he and Dr. Kassotis began to experience interference with their efforts to practice at Methodist. It is at this point when, Dr. Reddy alleges, doctors Sacchi and Puma began a pattern of exclusionary behavior, which included discouraging certain physicians at Methodist from referring patients to Dr. Reddy and Dr. Kassotis. In or about October 2003, Dr. Sacchi ordered that doctors Reddy and Kassotis be removed from general cardiology rounds at Methodist's residency program, thus hindering their contact with physicians who were a potential source of referrals. Dr. Reddy further alleges that either Dr. Sacchi or Dr. Puma informed a pharmaceutical company, falsely, that Dr. Reddy was

3

no longer on staff at Methodist. Dr. Puma also allegedly instructed several physicians' assistants at Methodist, who were assigned to its angioplasty program, not to provide post-operative care to Dr. Reddy's patients. Finally, Dr. Reddy contends that defendants manipulated the catheterization lab schedule in a way that limited his access and forced him to cancel office hours.

In August 2004, due to defendants' acts, Dr. Reddy resigned from his position as Methodist's chief of clinical cardiology but retained admitting privileges as an attending cardiologist. Upon resigning, Dr. Reddy opened an independent cardiology practice, with offices in Staten Island and Bay Ridge, Brooklyn. At about the same time, Dr. Kassotis resigned his position as head of electrophysiology at Methodist and joined Dr. Reddy's practice in Bay Ridge. Dr. Kassotis also retained privileges as an independent attending physician at Methodist.

Defendants' alleged anticompetitive acts continued even after doctors Reddy and Kassotis resigned from their positions at Methodist. In November 2004, it is alleged that Dr. Puma threatened to cause physical harm to Dr. Kassotis. In February 2005, Dr. Reddy avers that one of the defendants intentionally excluded him from a publicity photo shoot. Following that, between March and May of 2005, Dr. Reddy claims that Dr. Puma gave presentations to Methodist's administration, chair of medicine, practicing cardiologists, non-physician staff, and cardiology department in which he misrepresented Dr. Reddy's rate of complications. In response to these presentations, Methodist's chairman of the medicine department appointed a committee to investigate Dr. Reddy's performance but never advised Dr. Reddy of the investigation. The investigation allegedly revealed that there were no valid quality issues relating to Dr. Reddy's practice and that his complication rate was acceptable. Nevertheless, this series of events led to a

reduction in Dr. Reddy's base of referrals and consultation volume from Methodist doctors. Defendants' false statements, Dr. Reddy further alleges, became widely known to the medical profession, resulting in his being omitted from <u>New York Magazine's</u> "Best Doctors" list and losing referrals from physicians outside of the Methodist community.

Critically, as a Methodist insider, Dr. Reddy argues that "defendants and other physicians at Methodist Hosptial had the legal capacity to conspire between and among themselves because they have independent and competing economic interests and have not acted solely on behalf of or for the benefit of Methodist Hospital." (Compl. ¶ 48). Further, the complaint charges that "[d]efendants have caused material harm to competition by reducing the availability and number of providers of interventional cardiac services and by causing a demonstrable decline in the quality of patient care as well as by directing referrals and other resources to themselves and away from plaintiff." (Compl. ¶ 51). As a result, Dr. Reddy alleges that he "has been injured in his business or property by reason of the unreasonable restraint of commerce . . . ." (Compl. ¶ 52).

## DISCUSSION

Dismissal of a complaint for failure to state a claim upon which relief can be granted is only appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 197-98 (2d Cir. 2001) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . . ." <u>Todd</u>, 275 F.3d at 198 (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

The pleading standard in an antitrust case is not a heightened one. Twombly v. Bell Atlantic Corp., 425 F.3d 99, 106-09 (2d Cir. 2005), cert. granted, ___ U.S. ___, 126 S.Ct. 2965, ___ L.Ed.2d ___ (2006) ("We have consistently rejected the argument–put forward by successive generations of lawyers representing clients defending against civil antitrust claims–that antitrust complaints merit a more rigorous pleading standard . . . ."). "[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 554 (2d Cir. 1977) (citing Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir. 1957); 5 Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 1228 (1969)). In antitrust cases, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998) (quoting Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). As in an ordinary case, a plaintiff's complaint may satisfy the pleading standard by including a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). For purposes of a motion to dismiss, all of the allegations within plaintiff's complaint are assumed to be true. Tindall v. Poultney High Sch. Dist., 414 F.3d 281, 283 (2d Cir. 2005).

I.  *Antitrust Standing*

Standing is another matter. To determine whether a plaintiff has standing in an antitrust case, the Court must employ a two-prong inquiry that looks beyond the ordinary standing requirements. Specifically, the Court must ask: "(1) has the plaintiff asserted an antitrust injury and (2) is the plaintiff the proper plaintiff to assert the antitrust laws?" N.Y. Medscan LLC v.

6

N.Y.U. Sch. of Med., 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) (citing Balaklaw v. Lovell, 14 F.3d 793, 797 n.9 (2d Cir. 1994)).

First, to have antitrust standing, a plaintiff must be able to assert a type of injury that the antitrust laws were designed to prevent. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The asserted injury must be in harmony with the design of the antitrust laws to protect competition and not merely competitors. Balaklaw v. Lovell, 14 F.3d at 797. Harm to competition may be pled through allegations that a defendant's anticompetitive behavior had "adverse effects on the price, quality, or output of the relevant good or service." N.Y. Medscan, 430 F. Supp.2d at 146. The injury suffered by a competitor need not be the exact injury suffered by consumers, but, so long as the competitor's injury flows from the same alleged anticompetitive acts, the competitor will have satisfied the first prong in the test to determine standing to sue. See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); Consol. Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 258 (2d Cir. 1989); see also Pinhas v. Summit Health, Ltd., 894 F.2d 1024, 1032 (9th Cir. 1989), aff'd, 500 U.S. 322 (1991) ("Although the emphasis in determining whether an injury has occurred is properly on the injury to competition and not to the competitor, 'injury to competitors may be probative of harm to competition.'") (citations omitted).

Dr. Reddy alleges that defendants' exclusionary acts harmed his own practice. He also alleges that these acts "reduc[ed] the availability and number of providers of interventional cardiac services" and caused "a demonstrable decline in the quality of patient care" in the relevant market. (Compl. ¶ 51). The complaint avers that doctors Reddy and Kassotis accounted for 35 to 40% of the overall volume in that market prior to defendants' alleged exclusionary acts.

7

Connecting conduct to harm, plaintiff alleges further that defendants' anticompetitive behavior displaced him and Dr. Kassotis and, therefore, led to a marked decline in the overall provision of qualified services.

In the medical context, courts have repeatedly found such allegations sufficient to state an antitrust injury. See, e.g., Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 276 (3d Cir. 1999) (deterioration of quality or reduction of output is sufficient to show antitrust injury); N.Y. Medscan, 430 F. Supp.2d at 148 ("[T]he courts have repeatedly held that a decline in quality is among the injuries that the antitrust laws were designed to prevent.") (citations omitted). As noted in N.Y. Medscan, in the context of critical healthcare, "the quality of care is likely to be at least as important to patients as the price." Id.

Defendants contend that plaintiff has not alleged a market-wide reduction in quality. However, the complaint clearly alleges a decline in the quality of patient care, and the Court finds no reason to conclude that plaintiff's allegations are limited to some subset of the relevant market, as defendants contend. Further, only with discovery can plaintiff access statistics that would allow him to assess the market-wide effects of defendants' alleged anticompetitive behavior.[2] Finally, the substantial market share of doctors Reddy and Kassotis is alone a sufficient allegation to establish that their effective elimination from the relevant market could

---

[2] Defendants cite at length from Ezekwo v. Am. Bd. of Internal Med., 18 F. Supp. 2d 271 (S.D.N.Y. 1998). However, the cited portion, dealing with injury to competition, was decided on summary judgment and not on a motion to dismiss. This Court finds the Ezekwo decision particularly instructive in its statement that "in order to find market injury, the impact within [plaintiff's] market must be assessed, requiring some factual submission as to that market's structure and the services offered therein." Id. at 278. Such inquiry is proper on summary judgment, after plaintiff has had the opportunity, through discovery, to prepare a factual submission. If anything, the logic of Ezekwo militates against defendants' motion.

have had an impact on the quality and output of services in the relevant market as a whole.[3]

Next in the assessment of whether plaintiff has standing comes inquiry as to whether plaintiff is an efficient enforcer of the antitrust laws. Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 443 (2d Cir. 2005). On such inquiry, the Court must determine whether the interests of the plaintiff-competitor are aligned with those of consumers generally. In some instances, this might not be so. For instance, in Daniel, cited by defendants, the Second Circuit held that the plaintiffs lacked standing to sue because their interest was not in breaking a cartel and opening the marketplace, but instead in gaining profits that they would have earned as members of the cartel. 428 F.3d at 440-41. Such a case is an egregious example of a competitor's interests diverging from those of consumers. Here, however, Dr. Reddy's alleged interests do not diverge from consumers in any significant way as to deny him standing to bring suit. Notably, the primary alleged antitrust injury here is a decrease in the provision of qualified care. As Dr. Reddy correctly asserts, he is knowledgeable about defendants' anticompetitive conduct. In fact, as a cardiologist practicing in the relevant marketplace, he is among those most competent to show how defendants' alleged anticompetitive conduct has affected the quality of interventional cardiology services in that market. Moreover, because of the nature of the alleged injury to the public, which is widely dispersed, third parties have less incentive to sue, see Angelico, 184 F.3d

---

[3] The Court also rejects defendants' contention that the Court should dismiss plaintiff's complaint because plaintiff has failed to allege a "significant impact on the market." Defendants' base this argument on Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), which is wholly inapplicable here. In Jefferson Parish, the Supreme Court addressed a tying arrangement that was alleged to have violated Section 2 of the Sherman Act. Id. at 5-8. Justice Stevens, writing for a 5-4 majority, found that the tying arrangement had no significant impact on the market because it had not affected consumer choice, as there was no showing that consumers shopped for the tied product – anaesthesiology services. Id. at 27-28. Thus, in Jefferson Parish, the Court did not conclude, as defendants suggest, that the lack of a "significant impact on the market" should be found where only a single competitor has been eliminated from the market.

at 275, while Dr. Reddy's damages are more concrete and more easily demonstrable.

Angelico is most persuasive on this point. In Angelico, the Third Circuit addressed antitrust standing in a case where the plaintiff-doctor's injury stemmed from the defendants' efforts to exclude him from the relevant market. 184 F.3d at 274-75. The Court recognized that this kind of injury was the type of injury that the antitrust laws were designed to prevent. Id. Such is the case here, even more so, since Dr. Reddy is likely the only potential plaintiff with enough knowledge and incentive to bring suit. On the strength of the analysis in Angelico, this Court finds that Dr. Reddy is an efficient enforcer of the antitrust laws on the claims asserted and, therefore, has standing to bring suit.

II.     *Allegation of Conspiracy*

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. Thus, to show a violation of Section 1, a plaintiff "must first establish a combination or some form of concerted action between at least two legally distinct economic entities." Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993). Unilateral action by a single person or enterprise cannot violate Section 1. Id. Accordingly, courts have held that a Section 1 violation cannot be found based on the "joint action of wholly owned subsidiaries of a single entity, unincorporated divisions of a company, or employees of a single entity acting within the scope of their employment." Johnson v. Nyack Hosp., 954 F. Supp. 717, 722 (S.D.N.Y. 1997) (citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); VII PHILLIP E. AREEDA, ANTITRUST LAW ¶¶ 1462-74 (1986)). Where all the actors work

inside the walls of a single enterprise, a claim against them under Section 1 will fail under what is often referred to as the intra-corporate (or intraenterprise) conspiracy doctrine. See, e.g., Linder v. City of New York, 263 F. Supp. 2d 585, 591 (E.D.N.Y. 2003).

In moving to dismiss Dr. Reddy's complaint, defendants contend that he has failed to adequately allege an antitrust conspiracy between two economically distinct actors. In his complaint, Dr. Reddy alleges that defendants Puma and Sacchi were both physicians employed at and by Methodist Hospital. The Court must thus determine whether Dr. Reddy's allegations fail under intra-corporate conspiracy doctrine.

Due to the tangled economic relationships that exist among employers and employees in the medical field, the intra-corporate conspiracy doctrine will not always apply. A doctor's employment and financial arrangement with a hospital is often completely different from that which exists between an ordinary employer and salaried employee. One need look no further than plaintiff's complaint to find an example. While Dr. Reddy was employed by Methodist, he continued to teach and perform procedures at other institutions. In recognition of the unique aspects of employment in the medical field, courts have recognized that an antitrust conspiracy can exist among doctors who serve on the same medical staff, as those doctors remain sufficiently independent economic actors. See Capital Imaging Assocs., 996 F.2d at 544 (citing Bolt v. Halifax Hosp. Med. Ctr., 891 F.2d 810 (11th Cir. 1990)).

However, courts have also noted that while a medical staff has the capacity to conspire for antitrust purposes, not all actions of the staff may qualify as a conspiracy for purposes of Section 1. See Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 706 (4th Cir. 1991) (en banc); Bolt, 891 F.2d at 819 (11th Cir. 1990). In Capital Imaging Assocs., the Second Circuit held that

11

member physicians of an independent practice association were legally capable of conspiring among themselves because they were "independent practitioners with separate economic interests." 996 F.2d at 544. In so holding, the Court noted that "[a]s members of an independent practice association, the doctors are not staff physicians employed by the HMO on a salaried basis, that is, they are not agents of the HMO." Id. Thus, in affirming a summary judgment decision, the Second Circuit looked functionally at the relationship between actors, drawing a distinction for purposes of antitrust conspiracy that hinged on the doctors' independent economic interests rather than the doctors' titles. In the medical context, when deciding whether a doctor is distinct from his employer, the Court must look to the substance of the relationship. See Oksanen, 945 F.2d at 703 ("Consistent with Copperweld, we must examine the substance, rather than the form, of the relationship between the hospital and the medical staff. . . .").

Dr. Reddy has alleged that defendants were doctors employed by Methodist, yet his complaint contains no detail about the terms of their employment, e.g., whether they retained individual practitioner status in any capacity. In their moving papers, defendants contend that the "[c]omplaint appears to acknowledge the fact that, like plaintiff, both Dr. Sacchi and Dr. Puma were employees of Methodist." Defs.' Mem. Supp. Mot. Dismiss at 18. Defendants argue that the complaint suggests all of the parties involved are the type of salaried employees who cannot be distinguished from their employer, Methodist, under the intra-corporate conspiracy doctrine.

The Court disagrees. As an initial matter, the complaint refers to Dr. Reddy as a staff physician and acknowledges that Dr. Reddy continued to practice in other settings while he worked at Methodist. Further, Dr. Reddy's complaint specifically alleges that defendants Sacchi and Puma "have independent and competing economic interests" from Methodist. (Compl. ¶

48). As discussed, such competing economic interests are quite common for doctors working at a hospital and Dr. Reddy's assertion of defendants' competing economic interests separate and apart from their employment by Methodist is enough for the complaint to survive at threshold. In sum, given the allegation of competing economic interests, the wide range of anticompetitive acts alleged against defendants, and the need for further discovery regarding these issues — particularly given the length and breadth of modern medical practices — the Court concludes that defendants are not entitled to dismissal for failure to state a claim. Of course, should complete discovery show otherwise, defendants are free to move for summary judgment on the essence of the arguments asserted now.

## CONCLUSION

For the reasons set forth, defendants' motion is denied. Defendants are directed to answer the complaint as provided in the Federal Rules of Civil Procedure.

**SO ORDERED.**

Dated: Brooklyn, New York
September 19, 2006

ERIC N. VITALIANO
United States District Judge